MUSSER. *Appellant.* v. BRINK.

1. **Supreme Court**: FORMER DECISION IN SAME CASE. The Supreme Court, on a second appeal in a cause, will follow its previous decision, unless the facts developed on the re-trial require a different decision as applicable thereto.

2. **Partnership**: LANDLORD AND TENANT: FEEDING CATTLE ON SHARES. An agreement between landlord and tenant, as a part of the consideration for the lease of a farm, that the landlord shall furnish stock enough to eat the hay, oats and corn raised on the demised premises, the tenant to feed the stock, and upon sale being made, the landlord to be re-paid his purchase money first, out of the proceeds, and the remainder to be equally divided between the parties, does not constitute them partners in respect to the stock bought and fed under the agreement, following and re-affirming same case, 68 Mo. 242.

3. **Injunction.** The property in the cattle, under the agreement, remained in the landlord, and the contract having given the tenant no right to remove them from the farm or to dispose of them without the landlord's consent, injunction lies to prevent him from doing so. 68 Mo. 250.

*Appeal from Livingston Circuit Court:*—HON. E. J. BROADDUS, Judge.

REVERSED.

*C. H. Mansur* for appellant.

The law of this case was decided in appellant's favor when the case was here before, (68 Mo. 242,) and it is now *res adjudicata.* Wells on *Res Adjudicata,* §§ 513, 617; *Phelan v. San Francisco,* 20 Cal. 45; *Thompson v. Dill,* 34 Ala. 534; *Hawley v. Smith,* 45 Ind. 183. The facts as developed on the re-trial, do not take the case out of the doctrine of *res adjudicata.*

*John A. Cross* and *John E. Wait* for respondent.

The parties to the contract were partners as the case now stands, conceding the correctness of the former decision. 68 Mo. 242. In determining the meaning of a written instrument, the acts of the parties are entitled to great weight. *Patterson v. Scott,* 24 N. Y. 40; *Gunnison v. Bancroft,* 11 Vt. 493; *People v. Gosper,* 3 Neb. 285; *Nash v. Town,* 5 Wall. 689; *Ricker v. Fairbanks,* 40 Me. ——; *Cook v. Barr,* 39 Conn. 296. An injunction will not be granted when the right is doubtful. *Water Co. v. McCallum,* 5 Pa. St. 93. Nor because of the mere apprehension of the petitioner that a wrong may be done. *Goodwin v. Railroad Co.,* 43 Conn. 494.

EWING, C.—This case was before this court in 1878, (68 Mo. 242,) and was reversed and remanded. Upon the hearing at that time, the petition, answer and contract were set out in full, with the evidence at the former trial; and

so far, reference is had to that report. It is not necessary, for a full understanding of the questions involved, to re-state the pleadings and contract. On the new trial there was additional evidence on the part of the plaintiff; and the defendant offered evidence to maintain the issues on his part. At the first trial the defendant offered no evidence.

The plaintiff introduced William Middaugh, who said defendant told him, he had ordered Musser off the place. Said he was going to send the cattle to DeKalb county; said he had a right to sell them, but wanted to feed up the crop. That Musser came to his house in July, and at his request went to see Brink, and told him Musser had sold the cattle, and if he, Brink, would meet him at Cameron he would settle with him.

Angeline Moss testified, that at her house in February, 1875, she heard Brink say he intended to sell the cattle and put the money in his pocket. On cross-examination this witness said Brink said Mr. Musser would not beat him much.

A. W. Frederick, for plaintiff, testified that Brink told him he proposed taking the cattle to DeKalb county, north of Osborne. That Musser owned half the crop and the farm.

S. J. Moss had conversation with Brink on Musser's farm about September, 1874, about the cattle. Brink said he wanted me to herd them for him next summer in DeKalb county. Musser was present and said Brink was all right, and would do as he said. In February, 1875, Brink then told me Musser had become dissatisfied about the cattle; that he intended to take and herd them in DeKalb county, and said he did not think old man Musser would beat him much; that he intended to sell the cattle himself.

B. F. Jones testified: In the fall of 1875 stayed all night at Brink's. He said he had intended to take and herd them in DeKalb county; that he had, or claimed the right to sell them, and that Musser would never have known it if Moss had not betrayed him; that he knew it was Moss,

because he had not told any one else he intended to sell them.

Geo. Smith testified as to the financial standing of Brink; that he had no real estate, and was worth probably $800 or $1,000, "outside of his household plunder."

Solomon Musser, on his own behalf, testified as follows: September, 1874, I had eighty head of cattle on the farm of Conrad Smith, in Daviess county, about fifteen miles from my place in Caldwell county, where defendant lived; they were two-year-old past steers. I turned them over to defendant at a value of $2,200 at that time. He gave me a receipt for them. He was to take them into his possession at Coon Smith's, and was to pay for their herding up at Smith's until feeding time came that fall. I was present at the conversation when S. J. Moss was present. At that time I had confidence in Brink, and made no objection when he proposed to take or send the cattle the next spring and summer to DeKalb county to herd. Did not know at that time he claimed any right to sell the cattle under the agreement. During that winter I became much dissatisfied with Brink, and with his management on my place. Under the agreement, he was to feed hogs on the place with our joint corn. When I was at the place I learned, and could see, that hogs had been fed, but could not find the hogs; could see where they followed the cattle, but the hogs were not in sight. I learned that he had fattened twelve hogs and sent them to Lathrop to sell that fall. He also sold some hogs in Cameron, but don't know how many. I think he sold in all about $600 worth. About April, 1875, I learned he was determined to remove the cattle out of the county; I opposed it. I met Brink at the farm of Stucker, about a mile and a half from where Brink lived. I there told him I did not want the cattle moved. He then proposed to give a bond, for the purpose of securing and returning me the cattle. Proposed to give me one Fowler, of Ray county, on the bond. Wanted me to go with him to Ray county to see Fowler. I never told him

whether I would or not accept the bond. Do not remember that he proposed to give Dr. Crawford on the bond. Next day word came to me that Brink said he intended to remove the cattle. I went that night to Kingston, the county seat, and got out the papers for this injunction suit, and the next day the sheriff and myself went to Brink's to serve them. We got there early. Before I got there, I told the sheriff to say nothing about it until I could talk with Brink, as I wanted to have a talk with him, and I might be able to compromise it with him. We both went into the house and sat down, when Brink said, I suppose you have come to attach the cattle. I told him I had no attachment, whereupon Brink jumped up out of his seat, got very mad, accused me of swindling him in a receipt I had given him for some pasturing the fall before, and ordered me off the place, and forbid me ever to come back or set foot on the place while he was on it. I then got up and told the sheriff to do his duty and left.

*Cross-examination:* The fuss I had with Brink when the sheriff was there, took place just as I have told it. It was not over something else. I will state it again, just as it was, and let the judge decide what it was. Brink said, I suppose you have come to attach the cattle. I said I had no attachment. He then got mad and accused me of swindling him in a receipt about pasturing some cattle the fall before, and ordered me off the place. The receipt Brink gave me for the cattle I left at home. I did not know it would be wanted here. I had no notice to bring it. I think it reads about like this: September, 1874. I hereby receipt for eighty head of two-year-old past steers, to Solomon Musser, and guarantee him in payment for them $2,200, and one-half of the profits of feeding them for market, and I am to pay Conrad Smith's bill for herding them. I sold the cattle in July, 1875. I am to pay Brink one-half the profits, and I am to pay for herding the cattle until feeding time. Brink did talk about giving me a bond, but it was never agreed upon or completed. Neither the amount nor

who should go upon it. I never said I would take it, nor do I know that I said I would not. We were talking about it when I learned he was going to move the cattle, and I got out the injunction. I don't remember any talk about Crawford going on the bond.

Plaintiff then read in evidence the written contract, which will be found in 68 Mo. 242, and rested.

The defendant introduced Dr. Crawford, who testified he would have gone on Brink's bond to secure Musser's share of the cattle.

Al. Stucker, for defendant, testified: Musser and Brink were at his house and talked about removing the cattle to DeKalb; Musser told Brink he was opposed to his moving the cattle, and that he must not take them. Brink said he would give bond to secure Musser, and said he could give Fowler of Ray county, and Dr. Crawford, but did not tender a bond.

Francis M. Brink testified as follows: I am the defendant in this suit. I never told anybody that I intended to sell the cattle. I wanted to keep them and feed them, so as to get pay for my crop raised by feeding the cattle, as I was to be at all the expense of feeding the cattle, and as they could be herded much cheaper than I could get pasture to keep them in, I wanted to send them to DeKalb county to herd them on a section of land I had leased for that purpose. Musser was willing when I got the cattle first to have them taken there, but in the winter we began to have difficulties over the cattle and management of his farm by me, and then we had trouble. I did think I had the power to sell the cattle under the agreement, but I intended always, if I sold them, to pay Musser what was due him. I never intended to beat him out of his cattle. When spring came, as it was much cheaper to herd than to pasture, I was anxious to herd. I met him at Stucker's, and there I told him I would give him bond to secure him; that I would give him Fowler of Ray county, and Dr. Crawford. We talked the matter over. I did not arrange it

then with him, but intended to arrange and give him bond, but before I could do so, he got out this suit. When he and the sheriff came to my house I invited them in as kindly as I knew how, and commenced a talk with Musser, when Musser got mad and told the sheriff to levy upon the cattle. We did not quarrel over the receipt for pasture, but quarreled over his wanting to get the cattle away from me. I never told any one that I intended to sell the cattle, or that I intended to beat Musser; never told S. J. Moss nor Angeline Moss that I intended to sell the cattle; never told Jones, a witness in this case, that Moss had betrayed me to Musser. I was worth, at the time the cattle were enjoined, as follows: I had about $600 I got from the sale of some land in ―――― county. This I had in the hands of Dr. Crawford. I had besides, about $800 in money, and then I had my teams, farming implements, household plunder, etc., about $1,000 more. I kept a money account with Dr. Crawford, and one at the bank in Cameron. Can't state how much I kept on an average with Dr. Crawford; can't state how long the $600 staid with him; can't state whether I drew it out in large or small sums; don't know how long I left it with him; can't state that I kept an average of $300 with Dr. Crawford or not. I kept money in the bank at Cameron all the time I was on Musser's place, and whenever I wanted money for any purpose I checked it out. I did know at Stucker's that Musser was opposed to my taking the cattle to DeKalb county. I do not now, nor did not pretend at any time, to set up any other claim or right or control over the cattle, than such as I may have by virtue of the agreement read in evidence, dated March 13th, 1874. I did fatten and sell a lot of hogs to Lathrop, twelve in number, they were my own hogs, and I fattened them with my own crop of corn, raised on Gov. Smith's place in 1873. I kept my crop of corn over that year. It was worth about $200. I fed it mainly, and sold it together to live upon, during the year 1874. I never told anybody that I intended to beat Musser. I did say to Timmons that

I would rather give him every hog I had for nothing than that Musser should get one of them. I took fifty odd stock hogs of my own on Musser's place when I went there. I fed them during the winter of 1874, out of my own corn, the old crop raised the year before on Gov. Smith's place. I did sell some fat hogs of my own that year and some I think at Kidder.

This was the evidence in the case, and that of plaintiff and defendant is given in full.

I. The vital question in this case is the construction of the written agreement. It is insisted by the respondent that the evidence so materially changes the facts as that the contract must be construed as a partnership; that the contract must be construed in the light of the receipt given guaranteeing the $2,200, etc. That it is a question of preponderance of evidence. It is not a question of preponderance of evidence, but of construction of the written instrument; and unless the trial *de novo*, after reversal, developed facts which so changed the nature of the case as to require a different construction as applicable thereto, then we must follow the decision in 68 Mo., *supra*. In that case, SHERWOOD, C. J., said: "If we test the case at bar by the rule thus announced, it is very easy to see that the agreement in question does not evidence a partnership, and this, for the reason that it does not confer on each party power to manage the whole business and dispose of the property." The new evidence on the trial was the receipt sworn to by Musser and the testimony of Brink himself. Brink's testimony consisted mainly in contradicting witnesses who had sworn differently to himself, a number of whom corroborated each other upon the controverted points, and on this point we have no hesitation in holding that the additional evidence on the new trial does not change the facts "so as to require a new decision as applicable thereto." Wells on Res Adjudicata, § 619.

II. The remaining question is, under the evidence, did the circuit court err in refusing the injunction? The

circuit court could only refuse the injunction upon the theory that the written instrument in evidence constituted plaintiff and defendant partners; but under the construction placed upon the contract by this court, it would necessarily follow, as Justice SHERWOOD said, "that the property in the cattle remained in plaintiff, and no right to dispose of them was conferred by the contract on the defendant, nor to remove them from the farm of the plaintiff without his consent."

This being so, the evidence, we think, clearly made out a case for the granting of an injunction. And we therefore reverse the judgment below and remand the case, with instructions to the circuit court to make the injunction perpetual. All concur.